AUSA: Corinne Lambert Telephone: (313) 226-9129
AO 91 (Rev. 11/11) Criminal Complaint Special Agent: Megan So Telephone: (313) 590-4692

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

United States of America
v.
Laura Whisenant

Case No. Case: 2:26−mj−30550
Assigned To : Unassigned
Assign. Date : 9/8/2026
Description: RE: LAURA WHISENANT (EOB)

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 2017 - June 2023 in the county of Washtenaw in the Eastern District of Michigan, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 42 U.S.C. § 408(a)(5) | Social Security Representative Payee Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Megan SO - Special Agent
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

[signature]
*Judge's signature*

Date: September 8, 2026

City and state: Detroit, Michigan

David R. Grand - Magistrate Judge
*Printed name and title*

Save Print

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, **MEGAN SO,** being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1) I am a Special Agent with the Social Security Administration, Office of the Inspector General, Office of Investigations (SSA/OIG/OI) and have been so employed since February 2020. I hold a bachelor's degree in Business Administration from the University of Michigan–Dearborn. I am a graduate of the Federal Law Enforcement Training Center in Glynco, GA, having completed its Criminal Investigator Training Program. Additionally, I completed the Inspector General Investigator Training Program through the Council of the Inspector General on Integrity and Efficiency. Before becoming a Special Agent, I spent eleven years processing benefit applications and resolving benefit-related matters for the SSA, first as a Claims Representative, and then as an Operations Supervisor. My current job duties include conducting investigations of violations of Social Security laws and related statutes, including but not limited to Title 42 U.S.C. § 408(a)(5) (Social Security Representative Payee Fraud). I am authorized to execute warrants and make arrests.

2) I have been assigned to an investigation concerning the disposition of Social Security benefits issued to Laura WHISENANT (hereinafter

WHISENANT), who was serving in the capacity of representative payee for a vulnerable adult SSA beneficiary, R.W.

3) Based on my investigation thus far, there is probable cause to believe that WHISENANT, R.W.'s representative payee and niece, converted the SSA benefits intended for R.W. to her own use, in violation of Title 42 U.S.C. § 408(a)(5) (Social Security Representative Payee Fraud).

4) I have prepared this affidavit in support of a criminal complaint and arrest warrant for WHISENANT. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is presented for the limited purpose of showing there is sufficient probable cause for the requested complaint and arrest warrant and does not set forth all of my knowledge about this matter.

## INVESTIGATION SUMMARY

5) WHISENANT received monthly SSA benefits on behalf of R.W. from December 2013 through June 2023, when the SSA suspended R.W.'s benefits due to WHISENANT's failure to provide required information to the agency. R.W. suffers from mental impairments that prevent him from caring for himself and his finances, and thus require him to be assigned a

representative payee. As R.W.'s representative payee, WHISENANT was required to use his benefits for his needs, care, and in his best interest. In 2017, WHISENANT moved R.W. into a residence in Detroit, Michigan, knowing that it did not have running water, electricity, or heat (other than a wood burning fireplace). She occasionally provided him with food and clothing. R.W. lived in this residence without utilities until 2023, when Adult Protective Services (APS) removed R.W. from the home, citing deplorable living conditions not suitable for human habitation, as well as malnourishment. WHISENANT collected ~$1,500 to $1,800 per month on behalf of R.W. She alleged that she used all of R.W.'s SSA benefits for R.W.'s needs; however, she was unable to provide proof of her expenditures. Bank records indicate that WHISENANT accessed R.W.'s benefits by making cash withdrawals and purchases at various merchants, many of which were unrelated to R.W.'s care and needs. The SSA determined that WHISENANT misused $121,980.00 of R.W.'s benefits.

## PROBABLE CAUSE

### Social Security Program Background

6) The SSA administers programs under Title II of the Social Security Act, including the Retirement, Survivors, and Disability Insurance program.

Individuals who have paid Federal Insurance Contributions Act (FICA) taxes and who become disabled may qualify for Social Security Disability Insurance Benefits.

7) If it is determined that an SSA beneficiary is incapable of handling their own finances, the SSA will select a "representative payee" to assist with the management of SSA funds. As part of the representative payee application process, the applicant agrees to use the benefits for the care and needs of the beneficiary and is responsible for accounting for how the benefits were allocated. If the SSA learns that the representative payee is not using the money for the beneficiary's needs, it will stop sending money to the representative payee. If the representative payee did not use the benefits for the beneficiary as required, the SSA considers the benefits to have been "misused."

**Laura WHISENANT Investigation**

8) According to SSA records, R.W. became entitled to Social Security Disability Insurance Benefits in 1984 based on multiple mental impairments. His benefits automatically converted to retirement benefits when he attained full retirement age. R.W. requires a representative payee due to his mental impairments.

9) In November 2013, WHISENANT applied to be R.W.'s representative payee, after R.W.'s prior representative payee, his brother L.W., passed away. WHISENANT is L.W.'s daughter and R.W.'s niece. WHISENANT's application was approved, and she began receiving R.W.'s SSA payments in December 2013. From 2015 through 2018, WHISENANT completed annual representative payee accounting forms to document how R.W.'s benefits were spent. Beginning in 2019, the SSA sent her several requests for accounting forms, but she failed to complete and return them.

10) In May 2023, the SSA received an anonymous complaint, which alleged that R.W. was living without water, heat, electricity, or a pair of shoes, while a family member was managing his funds.

11) Following receipt of the allegation, the SSA notified WHISENANT that she was required to attend an in-person interview at the SSA office in Ann Arbor, Michigan. WHISENANT appeared for an interview on May 19, 2023, and provided the following written statement:

> I have been helping take care of my uncle [R.W.] since I was a little girl in 2013 when my Father passed I became the payee. I continue to pay bills & manage my uncles funds as my father had done. June of 2017 there was a Large House fire a[t] . . . (the family house) ther [sic] was over $100,000.00 worth of damage to the House (an electrical fire) Red Cross helped out an covered the cost of Hotel for a week. The next 2 week [sic] were paid for by my mother & myself. Staying at the House

> w/my uncle [R.W.] was my dad's cousin [V.R.]. He still had his mothers house in Detroit it did not have running water or electricity which he told us he would get back working. So my sister to [sic] [R.W.] & [V.R.] to the house in Detroit. Since that day I have be [sic] providing all of [R.W.] need to Him every month grocery, Fresh water, clothes, Hot meal, to him. I do use all of his money for him & most months I have to use my own money as well to make sure he has the basic needs.

12) After the interview, the SSA mailed WHISENANT multiple follow-up letters requesting proof of R.W.'s expenses, bank statements, and his address. WHISENANT failed to provide the required information, so the SSA suspended R.W.'s benefits effective June 2023, and referred the matter to the SSA/OIG.

13) Records obtained as part of the investigation in an effort to locate R.W. indicate that he was transported via ambulance to the hospital on July 31, 2023, after APS initiated a wellness check. In relation to the APS wellness check, the records indicated that on July 9, 2023, APS met with R.W. and provided him with canned food goods but was subsequently unable to obtain contact with him again until the day of the wellness check. APS described R.W.'s domicile as having no electricity, no running water, and not being suitable for human habitation.

14) APS filed a "Petition for Appointment of Guardian of Incapacitated Individual" on August 1, 2023, seeking court appointment of a guardian for R.W. based on the following:

> [R.W.] has no place to live, and no known income. [R.W.] was formerly a resident of Ypsilanti, MI. He is unable to advocate for himself due to undiagnosed mental health concerns. [R.W.] is at risk, he is staying in a home with a person [V.R.] with no running water, electricity, heat, or food. He appears malnurished [sic].

The guardianship petition was approved and, once the professional guardian was appointed, R.W. was moved to an assisted living home.

15) I interviewed R.W. at the assisted living home in January 2024; a male employee was also present. In response to questions, R.W. provided the following summarized information:

- R.W. did not remember when he moved into the assisted living home but estimated it was a couple of years ago. The male employee stated it had only been a few months, and R.W. confirmed that seemed accurate;
- R.W. does not pay bills, take medication, or have a phone;
- He does not know where his relatives are; and
- No one has given R.W. money lately.

I showed R.W. WHISENANT's Michigan driver's license photograph, and he identified her as "Laurie", his brother's daughter. R.W. was able to provide his basic identifying information but struggled to recall many other details.

16) I also spoke with the owner of the assisted living home, the male employee, and a female employee. The owner stated no one had paid her any money for R.W.'s care since his arrival. The male employee stated R.W. has dementia and his memory comes and goes. The male employee also stated R.W. only had the clothes he was wearing and, when asked about the whereabouts of his family, R.W. says he doesn't know where they are. The owner, male employee, and female employee all indicated that R.W. never had any visitors.

17) In January 2024, I interviewed R.W.'s cousin, V.R. In response to questions, V.R. provided the following summarized information:

- R.W. and V.R. are cousins but were raised like brothers. V.R. lived with R.W. since before R.W.'s brother, L.W., passed away *(Agent Note: L.W. passed away in November 2013.)*;

- R.W.'s mother had set up a bank account for R.W. L.W. was authorized on the account, and he later added WHISENANT to the account;
- R.W. and V.R. lived together in Ypsilanti, MI, and V.R. thought R.W.'s disability benefits paid the bills for the residence. After L.W. passed away, WHISENANT petitioned to be R.W.'s representative payee. WHISENANT paid the bills for the residence, however the amount being paid towards the bills, such as the amount of food, diminished overtime. After a fire in the residence, R.W. and V.R. were moved to the residence in Detroit by WHISENANT and her mother;
- After moving to the Detroit residence, R.W. did not receive any type of medical treatment or dental care;
- The Detroit residence did not have water, electricity, or heat. Initially, WHISENANT and her mother said that they would get an apartment for R.W., but they never did. R.W. continued to live at the Detroit residence until he was removed by APS;
- After R.W. and V.R. moved to the Detroit residence, WHISENANT visited about once every two weeks; however, that only lasted a

couple of months and then her visits varied. Sometimes she would not visit for a month, and one time, she didn't visit R.W. for five weeks;

- When WHISENANT visited, she brought the very bare minimum for R.W. Usually some canned food items, jugs of water, and a carry-out meal. She did not provide enough food for three square meals a day and provided no fresh food or vegetables. V.R. estimated the items she brought to be worth $25-$50;
- In the first couple of months, WHISENANT washed R.W.'s clothes for him. WHISENANT eventually stopped washing R.W.'s clothes and just bought him new clothes, but only after R.W. wore the clothes until they were so ridden with bacteria that they disintegrated. WHISENANT purchased the cheapest packs of underwear, socks, t-shirts, and pants. R.W. had to wear the same shoes until they deteriorated to the point that his toes were exposed. WHISENANT purchased a Carhartt coat for R.W., but only once his current coat fell apart; and
- V.R. spoke with WHISENANT's mother about how cold the house was, so WHISENANT brought over some used camping gear, such as

torn chairs and disposable handwarmers. She also purchased a grill for R.W.

18) In February 2024, I went to the Detroit residence and observed the following:

- V.R. showed me various pieces of clothing owned by R.W. The clothes were torn, coated in grime, and falling apart. His blue jeans were so coated with debris that they appeared stiff, and the sweatshirt zippers were hardened and fused together;
- The kitchen countertops were covered with cans, plastic bags, bottles, and garbage. The stove appeared inoperable;
- R.W.'s bed was a thin foam mattress covered in dirt that was lying on the floor. The pillowcases and blankets were coated with debris. The backside of the foam mattress had a large hole in it; and
- There was a fireplace with dark black soot running up the wall. V.R. indicated that was their only heat source.

V.R. indicated WHISENANT had been inside the home many times, and it was in this same condition when she visited. I showed WHISENANT's driver's license photograph to V.R., and he identified her as being R.W.'s niece, "Laurie" (aka WHISENANT).

19) I interviewed WHISENANT in May 2024. The following summarizes the information WHISENANT provided in response to questions:

- WHISENANT became payee for R.W. in 2013, after her father passed away;
- R.W. and his cousin, V.R., lived in a family residence [referring to the residence in Ypsilanti, MI] until there was a housefire in 2017. After the housefire, R.W. and V.R. stayed in a hotel for a few weeks and then moved to V.R.'s house in Detroit around July 2017;
- She knew that the Detroit residence did not have running water or electricity and that the fireplace was the only heat source;
- No other family members helped WHISENANT, and she did not have any other place for R.W. to stay;
- When R.W. first moved to Detroit, she used to cook and take R.W. meals and water every other day but then she started visiting him twice a week, and then it declined to once a week. The frequency declined around Covid in 2020;
- WHISENANT used all of R.W.'s money towards R.W., however she admitted that she comingled finances because she purchased groceries for several households;

- The items she purchased for R.W. included: clothing, hot meals like chicken and pizza, which cost about $50-80 each time, cigarettes, cases of water, shoes, Carhartt jackets, grills, stuff for the fireplace, and camper heaters with the green canisters;
- When it was bitter cold and around the holidays, WHISENANT paid for R.W. and V.R. to stay in hotels;
- R.W. did not have any expenses for a cell phone, utilities, rent, or medical, dental, or vision care; and
- WHISENANT last saw R.W. around July 2023.

WHISENANT indicated she was going to look for proof of R.W.'s expenses and that she would contact me when located. I requested that she provide any documents she could locate to me within 30 days. WHISENANT never contacted me or provided me with any documentation.

20) In the course of the investigation, I reviewed the Huntington National Bank records for the bank account in which R.W.'s SSA benefits were deposited for the period of March 2017 through May 2024. Some of the bank activity is summarized below:

Deposits into the account during this period included:

- R.W.'s monthly SSA payments amounting to approximately $118,842.00;
- R.W.'s Covid Economic Impact Payments from the IRS (May 2020 for $1,200.00, January 2021 for $600.00, and April 2021 for $1,400.00); and
- Approximately 48 deposits amounting to approximately $16,853.70, which were mainly cash deposits except for three checks written by WHISENANT to the account and one check written to WHISENANT.

Debits to the account included:

- Over 150 withdrawals amounting to approximately $50,000, processed via cash withdraw slips, ATM transactions, and checks written to WHISENANT;
- Over $33,000 in credit card payments;
- Over $7,600 in charges at cellular providers;
- Over $3,400 in charges from a female wellness business *(Agent Note: WHISENANT was a consultant for the business.)*;
- Over $3,400 in charges for vehicle related expenses;

- Over 50 charges at gas stations in Ann Arbor, MI or Ypsilanti, MI *(Agent Note: WHISENANT lives in Ann Arbor, MI.)*;
- Approximately $608.75 at nail studios, a gym, and a massage parlor;
- Approximately 15 monthly payments for a car wash membership in Ann Arbor, MI;
- Over 180 charges at fast food, restaurants, and/or bakery/coffee shops. Of those charges, over 120 were located in Ann Arbor, MI, or the close surrounding area; and
- Other merchant charges included: a women's clothing store, a Las Vegas nightclub, Tupperware, a hotel in Roseville, MI, liquor and wine stores, a trampoline park, and DTE Energy.

21) I provided the SSA with my investigative findings regarding WHISENANT. The SSA determined that WHISENANT misused $121,980.00 of R.W.'s SSA benefits from January 2017 through June 2023.

**CONCLUSION**

22) Accordingly, based upon my training, experience, and the facts set forth in this Affidavit, there is probable cause to believe that WHISENANT, while serving in an official capacity as representative payee, unlawfully converted

SSA benefits intended for R.W. to her own personal use, and did thereby knowingly and intentionally violate Title 42 U.S.C. § 408(a)(5).

I, MEGAN SO, Special Agent with the Social Security Administration, Office of the Inspector General, Office of Investigations, being duly sworn according to law, hereby affirm that the facts stated in the foregoing affidavit are true and accurate to the best of my knowledge, information, and belief.

MEGAN SO
Special Agent, SSA/OIG/OI

Sworn to before me and signed in my presence and/or by reliable electronic means.

DAVID R. GRAND
United States Magistrate Judge

September 8, 2026